UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

APRIL RICHEY,

       Plaintiff,                                    Hon. Wendell A. Miles

v.                                                     Case No. 1:07-CV-515

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

       Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

**STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 44 years of age at the time of the ALJ's decision. (Tr. 20, 47). She completed the ninth grade and successfully completed training to become a certified nursing assistant. (Tr. 136). Plaintiff worked previously as a medical receptionist, service coordinator, assistant manager, phlebotomist, and home health aide. (Tr. 72-78, 82, 92, 113-19).

Plaintiff applied for benefits on August 28, 2003, alleging that she had been disabled since January 20, 2001, due to back pain and depression. (Tr. 47-49, 91). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 21-46). On June 21, 2006, Plaintiff appeared before ALJ B. Lloyd Blair, with testimony being offered by Plaintiff and vocational expert, Melody Henry. (Tr. 745-78). In a written decision dated December 28, 2006, the ALJ determined that Plaintiff was not disabled. (Tr. 13-20). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on September 30, 2005. (Tr. 13); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## RELEVANT MEDICAL HISTORY

On April 26, 1999, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "minimal disc dessication at L5-S1 consistent with minimal degenerative disc disease." (Tr. 212). The examining physician reiterated that "this is very minimal in appearance." (Tr. 212).

In May 2000, Plaintiff began taking Vicodin to treat ankle pain. (Tr. 178). Plaintiff's treating physician, Dr. John Wycoff continued to authorize refills of Vicodin. (Tr. 169-77).

On October 2, 2000, Plaintiff was examined by Dr. Wycoff. (Tr. 168). Plaintiff reported that she was experiencing back pain that was "worse than it has ever been." (Tr. 168). Plaintiff walked "without any gait disturbance" and the results of a neurological examination were "normal." (Tr. 168). Plaintiff was "hypersensitive to touch" and "when asked to forward flex, she [was] just completely intolerant." (Tr. 168). The doctor concluded that "some" of Plaintiff's pain was "psychogenic." (Tr. 168). Dr. Wycoff issued Plaintiff a prescription for 100 Vicodin tablets, which the doctor stated "should last at least one month." (Tr. 168).

On October 9, 2000, Plaintiff was examined by a physician's assistant in Dr. Wycoff's office. (Tr. 167). Plaintiff complained of wrist pain, for which she was prescribed 30 Vicodin tablets. (Tr. 167).

On October 16, 2000, Plaintiff contacted Dr. Wycoff seeking a refill of her Vicodin prescription. (Tr. 167). Plaintiff reported that she was "out of Vicodin." (Tr. 167). The doctor approved Plaintiff's request. (Tr. 167). Plaintiff continued to receive refills of her Vicodin prescription. (Tr. 163-67). On July 17, 2000, Plaintiff was admitted to the hospital after overdosing on pain medication. (Tr. 557).

Between September 29, 2000, and December 20, 2000, Plaintiff received four series of pain injections to treat her back pain. (Tr. 535-44).

On February 11, 2001, Plaintiff telephoned Dr. Wycoff seeking pain medication. (Tr. 162). Plaintiff reported that "all her Vicodin was lost" when her basement flooded. (Tr. 162). The doctor approved Plaintiff's request. (Tr. 162).

On March 16, 2001, Plaintiff was examined by Dr. John Flood. (Tr. 146-47). Plaintiff reported that she was experiencing "constant" low back pain that she rated as 9 (on a scale of 1-10). (Tr. 146). Plaintiff reported that she can sit for "several hours," walk for one hour, and stand for "about 10 minutes." (Tr. 146). Plaintiff reported that she was "still working." (Tr. 146). An examination of Plaintiff's lumbosacral spine revealed tenderness with painful range of motion. (Tr. 147). Plaintiff exhibited no evidence of motor or sensory deficit, but straight leg raising was positive. (Tr. 147). The doctor instructed Plaintiff to participate in an exercise program. (Tr. 147).

In March 2001, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "a mildly degenerated disc at the L5-S1 level." (Tr. 187).

Treatment notes dated June 11, 2001, reveal that simultaneous to receiving treatment from Dr. Wycoff (who continued to prescribe her Vicodin), Plaintiff was also being prescribed Vicodin from a local pain clinic. (Tr. 161). When the pain clinic learned of this circumstance, it discharged Plaintiff from its care. (Tr. 161).

On June 19, 2001, Plaintiff was examined by Dr. Wycoff. (Tr. 161-62). Plaintiff reported that she was experiencing "disabling" back pain and "cannot function without taking up to 10 Vicodin per day." (Tr. 161). Plaintiff exhibited "decreased" range of low back motion, but

5

straight leg raising was negative. (Tr. 161). The doctor concluded that the cause of Plaintiff's complaints of back was "unclear." (Tr. 161).

On July 9, 2001, Dr. Wycoff reported that Plaintiff "has a multitude of problems, most of which are psychological and psychosocial." (Tr. 159). The doctor further reported that Plaintiff "may need extensive psychotherapy, although she is reluctant to entertain this as a diagnosis." (Tr. 159).

On July 19, 2001, Plaintiff reported that she was experiencing nausea and vomiting after "smoking dope over the weekend." (Tr. 157).

On July 31, 2001, Plaintiff was examined by Dr. Thomas Phillips. (Tr. 179-82). Plaintiff reported that she was experiencing back pain which ranged between 7-10 (on a scale of 1-10). (Tr. 179). Plaintiff walked without limp or difficulty and straight leg raising was negative. (Tr. 180). Plaintiff exhibited limited range of back motion. (Tr. 180). Plaintiff exhibited 5/5 strength in her lower extremities and the doctor discerned no evidence of reflex or sensory impairment. (Tr. 180). Dr. Phillips reported that while there existed "some evidence of mild degenerative disc disease at L5-S1, this focal disc abnormality does not correlate with" Plaintiff's "elaborate" subjective allegations of pain and disability. (Tr. 181).

On August 3, 2001 Plaintiff contacted Dr. Wycoff's office requesting a prescription for Vicodin to replace one she had been given four days earlier. (Tr. 154). Plaintiff reported that "a friend of her step-son" had stolen her Vicodin. (Tr. 154).

On September 5, 2001, Plaintiff was issued 100 Vicodin tablets. (Tr. 151). On September 14, 2001, Plaintiff reported that she was "going through withdrawal" and needed more Vicodin. (Tr. 149). Dr. Wycoff concluded that Plaintiff was "addicted to drugs." (Tr. 149).

On September 17, 2001, Plaintiff was admitted to Foote Hospital for treatment of her "opiate abuse of Vicodin and Darvocet." (Tr. 236). Plaintiff was discharged on September 29, 2001, at which time she was diagnosed with opiate dependence, history of cocaine dependence, and substance abuse mood disorder. (Tr. 233).

On September 26, 2001, Plaintiff participated in a discography examination, the results of which revealed an abnormality of the L5-S1 disc. (Tr. 503-05). On November 2, 2001, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "a small annular tear" at L5-S1, as well as "mild diffuse degenerative changes." (Tr. 493).

On April 19, 2002, Plaintiff was examined by Dr. Beinaz Menagi. (Tr. 260). Plaintiff reported that she was experiencing back pain which rated as 10 (on a scale of 1-10). (Tr. 260). An examination of Plaintiff's lumbosacral spine revealed "moderate" tenderness. (Tr. 260). Straight leg raising was positive, but there was no evidence of strength or sensory deficit. (Tr. 260). On May 21, 2002, Plaintiff again rated her back pain as 10 (on a scale of 1-10). (Tr. 259).

On June 20, 2002, Plaintiff was admitted to Foote Hospital for treatment of "her opiate abuse issues." (Tr. 227-30). Plaintiff was discharged on June 27, 2002, at which time she was diagnosed with opiate dependence, history of polysubstance abuse, and substance induced mood disorder. (Tr. 227). Plaintiff's GAF score was rated as 70.[1] (Tr. 227).

---

[1] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV). A score of 70 indicates "some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

On August 19, 2002, Plaintiff again rated her back pain as 10 on a scale of 1-10. (Tr. 257). On September 4, 2002, Plaintiff received an epidural steroid injection to treat her back pain. (Tr. 208-09).

On September 10, 2002, Dr. Ashok Kaul completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 606-19). Determining that Plaintiff suffered from a substance induced mood disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 607-15). Dr. Kaul determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 616). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 616). The doctor also concluded that Plaintiff suffered from opioid dependence. (Tr. 614).

Dr. Kaul also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 621-23). Plaintiff's abilities were characterized as "moderately limited" in three categories. (Tr. 621-22). With respect to the remaining 17 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 621-22). Dr. Kaul concluded that Plaintiff was "capable of [performing] unskilled work on a sustained basis." (Tr. 623).

Plaintiff received injection therapy treatments on September 20, 2002, and October 4, 2002. (Tr. 205-07).

8

On November 7, 2002, Plaintiff was admitted to Foote Hospital for treatment of her substance abuse. (Tr. 220-26). Plaintiff was discharged on November 22, 2002. (Tr. 220). Later that day, Plaintiff was examined by Dr. Menagi. (Tr. 253). Plaintiff rated her back pain as 4 (on a scale of 1-10) and also reported that her depression was "controlled." (Tr. 253).

On December 4, 2002, Plaintiff rated her back pain as 2 (on a scale of 1-10). (Tr. 253).

On May 1, 2003, Plaintiff was admitted to Foote Hospital for treatment of her substance abuse. (Tr. 217-19). Plaintiff was discharged on May 6, 2003. (Tr. 219).

On June 30, 2003, Plaintiff was admitted to the hospital to treat nausea and vomiting. (Tr. 214-16). During her hospital stay, Plaintiff experienced a seizure which doctors attributed to pain medication she was taking. (Tr. 216). On June 30, 2003, Plaintiff participated in a CT scan of her brain, the results of which revealed "no evidence for acute intracranial process." (Tr. 360). On July 3, 2003, Plaintiff participated in an MRI examination of her brain, the results of which revealed "minimal" inflammatory changes with "no evidence of cerebellar or cerebral cortical stroke." (Tr. 351-52). On July 6, 2003, Plaintiff participated in a CT scan of her brain, the results of which were "negative." (Tr. 347).

On July 8, 2003, Plaintiff participated in an MRI examination of the lumbar spine, the results of which revealed "a small annular tear at the L5-S1 vertebral disc space," with no evidence of "canal stenosis." (Tr. 339-40).

On August 3, 2003, Plaintiff was admitted to the hospital after consuming "30 Darvocet" tablets. (Tr. 285-90). The treating physician concluded that this was not a suicide attempt, but simply an "overdose." (Tr. 290).

On November 20, 2003, Plaintiff participated in a consultive examination conducted by Steve Geiger, Ph.D. (Tr. 568-72). Plaintiff reported that she was disabled due to back pain and depression. (Tr. 568). Plaintiff reported that she has "never had a problem with alcohol." (Tr. 568). Plaintiff also "denied ever having problems with other drugs" and claimed that she only takes medication "as it is prescribed." (Tr. 568-69). Plaintiff also reported that she smokes marijuana "3 times per week." (Tr. 569). The results of a mental status examination were unremarkable. (Tr. 570-71). Plaintiff was diagnosed with (1) major depression, recurrent, moderate; and (2) opioid dependence. (Tr. 572).

On December 7, 2003, Rom Kriauciunas, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 577-90). Determining that Plaintiff suffered from major depression, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 578-86). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 587). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and once or twice experienced episodes of decompensation. (Tr. 587). The doctor also concluded that Plaintiff suffered from opioid dependence. (Tr. 585).

Dr. Kriauciunas also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 591-93). Plaintiff's abilities were characterized as "moderately limited" in six categories. (Tr. 591-

93). With respect to the remaining 14 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 591-93). The doctor concluded that:

> Claimant is able to do unskilled work. Is able to do simple tasks on a sustained basis. Claimant is moderately limited in ability to remember, carry out detailed instructions, to maintain attention and concentration for extended periods. Also, is moderately limited in ability to interact with the general public, to maintain socially appropriate behavior, and to respond to changes at work.

(Tr. 593).

On May 14, 2004, Plaintiff participated in an EEG examination, the results of which were "mildly abnormal. . .suggesting the potential for seizures." (Tr. 702).

On June 2, 2004, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "minimal" disc bulging at T11-12, L2-3, L3-4, and L4-5 with no evidence of central canal stenosis. (Tr. 701).

On October 4, 2004, Plaintiff reported to the hospital after recently experiencing a seizure and "intractable headaches." (Tr. 693). Even after receiving "high doses" of Dilaudid, Plaintiff complained that "her headache was not controlled, raising the question of. . .possible narcotic dependence." (Tr. 693-94). A CT scan of Plaintiff's brain revealed "no evidence of a mass, mass effect, edema or evidence of acute hemorrhage." (Tr. 695). Plaintiff was prescribed medication to treat her seizures. (Tr. 694).

Treatment notes from the MSU Department of Neurology and Ophthalmology, dated December 7, 2004, indicate that Plaintiff was "doing fairly well." (Tr. 711).

On January 22, 2005, Plaintiff participated in an MRI examination of her lumbar spine, the results of which revealed "broad-based disc bulge or disc protrusion at L5/S1 with mild associated disc dessication." (Tr. 633). There was no evidence of canal stenosis. (Tr. 633).

Treatment notes from the MSU Department of Neurology and Ophthalmology, dated April 12, 2005, indicate that Plaintiff was "doing fairly well, no seizures." (Tr. 710). Treatment notes from the MSU Department of Neurology and Ophthalmology, dated October 18, 2005, indicate that Plaintiff was "doing good, no seizures." (Tr. 719).

On October 31, 2005, Plaintiff participated in an MRI examination of her brain, the results of which revealed "nonspecific. . .hyperintensities," but otherwise the results were "unremarkable." (Tr. 721).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[2] If the Commissioner can make a

---

[2] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) depression, (2) seizures, and (3) degenerative disc disease. (Tr. 15). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 17). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 17-20). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that as of the date her insured status expired, Plaintiff retained the capacity to perform work activities subject to the following restrictions: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) she can stand, walk, and sit for six hours each during an 8-hour workday, (3) she requires a sit-stand option, (4) she can never climb ladders, ropes, or scaffolds, (5) she can only occasionally stoop, crouch, kneel, crawl, or climb ramps/stairs, (6) she can only perform simple, unskilled work involving one, two, or three step instructions, (7) she is unable to perform jobs that require her to read, compute/calculate, problem solve, or reason, (8) she cannot perform jobs that involve concentration on detailed/precision tasks or multiple/simultaneous tasks, and (9) she can only have brief and superficial contact with the general public. (Tr. 17). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to

question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Melody Henry.

The vocational expert testified that there existed more than 13,500 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 774-76). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

      a. The ALJ Properly Assessed Plaintiff's Residual Functional Capacity

Plaintiff asserts that the ALJ's RFC determination is not supported by substantial evidence. Specifically, Plaintiff asserts that the ALJ's RFC determination fails to account for the severity of her back pain, which necessitates that she "lie down at various times throughout the normal workday," as well as her "difficulty sitting" and "difficulty concentrating." (Dkt. #8 at7).

The objective medical evidence, as detailed above, does not support Plaintiff's assertion that her back condition necessitates that she lie down throughout the day. Plaintiff is not

a candidate for surgery and has been treated with conservative methods. Moreover, none of Plaintiff's care providers have expressed the opinion that Plaintiff is so impaired. The Court also notes that Plaintiff's allegations regarding the severity of her back pain are not consistent with her reported activities, which included a July 2005 camping trip. (Tr. 731). Moreover, while the Court does not dispute that Plaintiff experiences some difficulty sitting and concentrating, such difficulties are sufficiently accounted for in the ALJ's RFC determination.

        The Court recognizes that Plaintiff's testimony at the administrative hearing paints a much different picture of her condition than revealed by the objective medical evidence. It must be remembered, however, that the administrative hearing occurred well after the expiration of Plaintiff's insured status. Even were the Court to credit Plaintiff's testimony about her then present condition, the record in this case does not indicate that any such deterioration occurred prior to the expiration of her insured status. In sum, as detailed above, substantial evidence supports the ALJ's finding regarding Plaintiff's RFC as of the date her insured status expired.

        b.   The ALJ Properly Evaluated Plaintiff's Impairments

        As noted above, the ALJ determined that Plaintiff suffers from the following severe impairments: (1) depression, (2) seizures, and (3) degenerative disc disease. Plaintiff asserts that the ALJ erred by not also concluding that she suffered from "other ailments, such as TMJ, calcification in the brain, severe and chronic pain, the need to lie down every day during the day, memory problems, cardiac abnormalities, stomach problems, and did not consider Plaintiff's ailments taken in combination." (Dkt. #8 at 12).

A severe impairment is defined as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities," 20 C.F.R. § 404.1520(c), and which lasts or can be expected to last "for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). An impairment is less than severe only if it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." *Williamson v. Secretary of Health and Human Services*, 796 F.2d 146, 151 (6th Cir. 1986) (citations omitted).

The medical evidence does not suggest that any of these conditions constitutes a "severe" impairment. However, even if the ALJ erred in this regard it does not call into doubt the substantiality of his ultimate conclusion that Plaintiff is not disabled.

At step two of the sequential disability analysis articulated above, the ALJ must determine whether the claimant suffers from a severe impairment. The Sixth Circuit has held that where the ALJ finds the presence of a severe impairment at step two and proceeds to continue through the remaining steps of the analysis, the alleged failure to identify as severe some other impairment constitutes harmless error so long as the ALJ considered the entire medical record in rendering his decision. *See Maziarz v. Sec'y of Health and Human Services*, 837 F.2d 240, 244 (6th

Cir. 1987); *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir., Feb. 22, 2008) (citing *Maziarz*, 837 F.2d at 244); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583-84 (6th Cir., Nov. 9, 2007) (same).

Here, the ALJ determined that Plaintiff suffered from severe impairments at step two of the sequential analysis and continued with the remaining steps thereof, considering in detail the medical evidence of record. Moreover, as noted above, the ALJ's RFC determination is supported by substantial evidence. Thus, even if the Court were to conclude that the ALJ erred in failing to identify all of the "severe" impairments from which Plaintiff suffers, such does not call into question the substantiality of the evidence supporting the ALJ's decision. *See Heston v. Commissioner of Social Security*, 245 F.3d 528, 535-36 (6th Cir. 2001) (recognizing that remand to correct an error committed by the ALJ unnecessary where such error was harmless); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("no principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Berryhill v. Shalala*, 1993 WL 361792 at *7 (6th Cir., Sep. 16, 1993) ("the court will remand the case to the agency for further consideration only if 'the court is in substantial doubt whether the administrative agency would have made the same ultimate finding with the erroneous finding removed from the picture...'").

Accordingly, the Court finds that the ALJ properly identified the "severe" impairments from which Plaintiff suffers. Moreover, even if the ALJ erred in this regard it does not call into doubt the substantiality of his ultimate conclusion that Plaintiff is not disabled.

     c. The ALJ Properly Relied on the Vocational Expert's Testimony

    Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996). The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed more than 13,500 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon her response thereto.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: August 7, 2008

/s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge